AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
## for the
### Central District of California

United States of America

v.

Christopher Soto, aka "Slim,"

Defendant

Case No.  2:22-mj-03070-DUTY

FILED
CLERK, U.S. DISTRICT COURT
8/5/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: clee  DEPUTY



LODGED
CLERK, U.S. DISTRICT COURT
8/5/2022
CENTRAL DISTRICT OF CALIFORNIA
BY: JB  DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of June 7, 2022, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 922(g)(1) | Felon in Possession of Firearms and Ammunition |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Ramel Moore
Complainant's signature

Ramel Moore, FBI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: August 5, 2022

Judge's signature

City and state: Los Angeles, California    Hon. Steve Kim, U.S. Magistrate Judge
Printed name and title

AUSA: Julia Hu (x3802)

**AFFIDAVIT**

I, Ramel Moore, being duly sworn, declare and state as follows:

## I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against CHRISTOPHER SOTO ("SOTO"), aka "Slim," for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Firearms and Ammunition.

2. This affidavit is also made in support of an application for a warrant to search a black Infiniti Q50 sedan, bearing California license plate number 9AVW714 (the "SUBJECT VEHICLE") as described more fully in Attachment A-1, and the following digital device seized on August 2, 2022, by the Los Angeles Police Department ("LAPD"), and currently in custody of the Federal Bureau of Investigation ("FBI") in Los Angeles, California, as described more fully in Attachment A-2: black Apple iPhone with no external markings believed to belong to SOTO (the "SUBJECT DEVICE").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 922(g)(1) (felon in possession of a firearm and ammunition), 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances); 21 U.S.C. § 846 (conspiracy and attempt to distribute and possess with intent to distribute controlled substances); 21 U.S.C. § 924(c) (possession of a firearm in furtherance of drug trafficking) (the "Subject Offenses"), as described more fully in Attachment B.

Attachments A-1, A-2, and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all dates and times are approximate.

## II. BACKGROUND OF AFFIANT

5.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since December 2021.

6.  I am currently assigned to a Criminal Gang Enterprise Squad at the Los Angeles Field Office of the FBI, which investigates criminal gang activity.  I am also a member of the FBI Los Angeles Metropolitan Task Force on Violent Gangs, a multi-agency federal, state, and local gang task force.

7.  I received basic law enforcement training at the FBI Academy in Quantico, Virginia, from December 2021 to April 2022.  This training focused on topics to include, but not limited to, law, ethics, behavioral sciences, interviewing and interrogation techniques, forensic science, investigative and intelligence techniques.  In addition to the Basic Field Training, I have

received training on how to conduct criminal investigations related to street gangs, criminal enterprises, counterterrorism, counterintelligence, weapons of mass destruction, and cybercrime.  I received numerous hours of training related to basic firearms use, identification, and safe rendering.

     8.   Prior to becoming a Special Agent, I was employed as a United States Probation and Pretrial Services Officer for the United States Probation and Pretrial Services Agency in the Eastern District of New York between January 2018 and October 2021 and the Central District of California between November 2021 and December 2021.  In that position, I was responsible for supervising and investigating defendants charged with federal crimes and placed on pretrial supervision.

     9.   During my tenure, I supervised defendants charged with and convicted of federal violations to include crimes against children, fraud, human trafficking, terrorism, firearms, racketeering, gangs, and narcotics while in the location monitoring and cyber monitoring programs.  I have interviewed numerous gang members, narcotic traffickers, firearm traffickers, organized crime members and reviewed documentation related to their criminal conduct.  I investigated defendants who violated federal, state, and/or local laws, and court-ordered bail conditions, while on pretrial release and petitioned the Court for action, to include bail revocation and detention.  I am familiar with the methods, language, structures, and criminal activities of street gangs and criminal syndicates through my training and experience.  I have conducted

computer forensic examinations, searches, and imaging of digital devices with cyber software, to include Cellebrite and EnCase, pursuant to court-orders to obtain evidence and/or fruits of a crime, and to identify bail violations.

10.  I received a Master of Professional Studies degree in Homeland Security and Criminal Justice Leadership, in May 2018. I received a Bachelor of Science degree in Criminal Justice: Law Enforcement Technology, in May 2016.

### III.  SUMMARY OF PROBABLE CAUSE

11.  On June 7, 2022, Los Angeles Sheriff's Department ("LASD") deputies stopped SOTO, whom they recognized as an active parolee with search terms, and his wife, K.S., as they were walking away from the SUBJECT VEHICLE, which was parked in front of the Knights Inn Motel in Los Angeles, California (the "Motel").  Deputies searched SOTO's person and found the SUBJECT DEVICE, as well as heroin, marijuana, and fentanyl.

12.  Deputies obtained search warrants for the SUBJECT VEHICLE and Room 235 of the Motel, where SOTO and K.S. were staying, which they executed on June 7, 2022.  In the SUBJECT VEHICLE, deputies found a case containing a Polymer80 ghost gun, 0.4074 grams of alprazolam, and $2,020 in cash, as well as a loaded Glock, Model 17, semi-automatic 9mm Luger caliber pistol, bearing serial number AEN070.  In Room 235 of the Motel, deputies found a purse containing a loaded Smith & Wesson .38 caliber revolver, bearing serial number K977021, $429 in cash, and an insurance card belonging to SOTO.  Subsequent DNA

comparison analysis confirmed that SOTO's DNA was present on all three firearms found on June 7, 2022.

13. On August 2, 2022, SOTO and K.S. were pulled over by LAPD officers in the SUBJECT VEHICLE. As K.S. tried to flee from the officers, the SUBJECT DEVICE and suspected methamphetamine fell from her person. During a search of K.S.'s person, officers found a loaded Kahr Arms, Model CW9093, 9mm caliber semi-automatic pistol, bearing serial number G021470.

14. SOTO has felony convictions for robbery and assault with a deadly weapon and is therefore prohibited from possessing firearms and ammunition.

## IV. STATEMENT OF PROBABLE CAUSE

15. Based on my review of law enforcement reports, body camera footage, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

   A. **On June 7, 2022, LASD Found Three Firearms, Heroin, Marijuana, Fentanyl, and Alprazolam in the SUBJECT VEHICLE, Motel Room 235, and SOTO's Person**

      1. <u>On June 7, 2022, LASD Conducted a Parole Search of SOTO and Found Heroin, Marijuana, and Fentanyl</u>

16. My review of an LASD arrest report dated June 7, 2022, as well as body worn camera footage from LASD deputies, revealed the following.

17.     On June 7, 2022, LASD Deputies Gonzales and Reed were conducting a routine patrol check in the rear parking lot of the Motel.[1]

    a.     While driving in the north parking lot in a marked police car, the Deputies observed a man, later identified as SOTO, glance in their direction and walk quickly away from the SUBJECT VEHICLE.

    b.     Deputy Gonzales observed a woman, later identified as K.S., walking several feet in front of SOTO.

    c.     As the Deputies drove closer to SOTO, Deputy Gonzales recognized SOTO from the tattoos on SOTO's person associated with the Pico Nuevo 13 Street Gang.

18.     SOTO was holding the SUBJECT DEVICE as deputies approached him in the parking lot.[2]

19.     Deputy Gonzales had prior knowledge from the use of departmental resources that SOTO had an active parolee no bail warrant for his arrest.  Deputy Gonzales stopped his patrol vehicle and detained SOTO pending confirmation of his parole warrant.

20.     Pursuant to SOTO's parole search and seizure condition, Deputy Gonzales searched SOTO's person and recovered a black bag from his front right pants pocket.

---

[1] The Knights Inn Motel, and the vicinity thereof, is known to law enforcement as a high-crime area frequented by members of the Pico Nuevo 13 street gang, wherein, numerous narcotics and weapons arrests have been made.

[2] The SUBJECT DEVICE was originally seized from SOTO's person by LASD.  However, on June 30, 2022, K.S. picked up the SUBJECT DEVICE from LASD.

   a. The black bag contained three individually wrapped bindles of suspected narcotics.

   b. Subsequent lab testing confirmed that the black bag contained 12.5 grams of heroin, 36.93 grams of plant material containing cannabis and/or hemp, and 18.04 grams of fentanyl. Based on my training and experience, I know that heroin and marijuana are Schedule I controlled substances, and fentanyl is a Schedule II controlled substance.

 21. Deputy Gonzales escorted SOTO to the rear driver's side of his patrol vehicle to detain him. As Deputy Gonzales attempted to open the door, SOTO attempted to flee on foot. Deputy Gonzales regained control of SOTO's hands without resistance, handcuffed him, and placed him in the rear of his patrol vehicle.

 22. Deputy Gonzales conducted a records check, which confirmed that SOTO was the subject of the outstanding parolee no bail warrant.

  2. <u>LASD Deputies Obtained Search Warrants for the SUBJECT VEHICLE and Knights Inn Motel Room 235</u>

 23. Based on my review of an LASD arrest report dated June 7, 2022, body worn camera footage from LASD deputies, and search warrants, I know the following.

 24. Deputy Gonzales spoke with K.S., who confirmed that she was SOTO's wife.

 25. Deputy Gonzales conducted a record check and determined that K.S. was the registered owner of the SUBJECT VEHICLE.

7

26. On the lower driver's side corner of the SUBJECT VEHICLE, Deputy Gonzales saw a white "Knight Inn" parking sticker with a check-in date written on it "06/07." Deputies saw K.S. leaving room 235 of the Motel.

27. On June 7, 2022, the Honorable Margaret M. Bernal, Judge of the Los Angeles Superior Court, Southeast Judicial District, issued a warrant authorizing a search of room 235 of the Motel, the SUBJECT VEHICLE, and the persons of SOTO and K.S.

    3. <u>During a Search of the SUBJECT VEHICLE, Deputies Found Two Loaded Firearms and 0.4074 Grams of Alprazolam</u>

28. Based on my review of an LASD arrest report dated June 7, 2022, body worn camera footage from LASD deputies, and lab results, I know the following.

29. On June 7, 2022, LASD deputies executed the search warrant for the SUBJECT VEHICLE.

30. On the floorboard behind the driver's seat, deputies found a black case. The case contained the following:

    a. A Polymer 80 pistol bearing no serial number on the frame[3] (commonly referred to as a "ghost gun"), with a 17-round magazine attached to it;

    b. A small plastic bindle containing a crystalline substance, which subsequent lab testing confirmed contained 0.4074 grams of alprazolam; and

---

[3] The frame had a slide for a Glock, Model 26, semi-automatic 9mm caliber pistol, bearing serial number BEUK170. In my training and experience, it is common for individuals to combine gun parts with and without serial numbers to create a firearm.

8

   c. Two separate envelopes containing cash totaling $2,020.

 31. From underneath the mat on the same floorboard, deputies found a Glock, Model 17, semi-automatic 9mm Luger caliber pistol, bearing serial number AEN070. The Glock Model 17 was loaded with 24 rounds of 9mm Luger ammunition.

 32. In the front of the SUBJECT VEHICLE, deputies found documents in SOTO's name, including a Prohealth medical document.[4]

   4. <u>During a Search of Knights Inn Motel Room 235, Deputies Found a Loaded Revolver and Cash</u>

 33. Based on my review of an LASD arrest report dated June 7, 2022, body worn camera footage from LASD deputies, and lab results, I know the following.

 34. On June 7, 2020, deputies executed the search warrant for room 235 of the Motel.

 35. On the bed, deputies found a black Michael Kors purse. Inside the purse, deputies found the following:

   a. A Smith & Wesson .38 caliber revolver, bearing serial number K977021. The revolver was loaded with six rounds of .38 caliber ammunition;

   b. Cash totaling $429;

   c. An insurance card belonging to SOTO; and

   d. A California driver's license belonging to K.S.

---

[4] K.S.'s name was on the other documents found in the front of the SUBJECT VEHICLE, including a Knights Inn Motel parking registration card, a Prohealth medical document, and vehicle inspection form.

        5.    <u>DNA Testing Confirms that SOTO's DNA Is Present on All Three Firearms</u>

36. Based on my review of LASD reports, I know the following.

    a. On June 7, 2022, LASD deputies arrested SOTO and K.S.

    b. While being processed at the Pico Rivera Station, SOTO and K.S. voluntarily submitted DNA samples.

    c. DNA samples were recovered from the two firearms found in the SUBJECT VEHICLE (the Glock Model 17 pistol and Polymer80 ghost gun) and the firearm found in the motel room (the Smith & Wesson revolver).

37. According to an LASD lab report dated July 26, 2022, SOTO's DNA was present on all three firearms. Specifically, the lab determined:

    a. SOTO's DNA was present on the trigger of the Polymer80 ghost gun, as well as the magazine attached to it.[5]

    b. SOTO's DNA was present on the grip of the Glock Model 17, as well as the magazine attached to it.[6]

    c. SOTO's DNA was present on the grip, trigger, and barrel of the Smith & Wesson revolver, as well as the six rounds of ammunition loaded within it.[7]

---

[5] K.S.'s DNA was also present on the trigger and magazine.

[6] K.S.'s DNA was also present on the grip and magazine.

[7] K.S.'s DNA was also present on the grip, trigger, barrel, and trigger. The lab concluded that there was limited support for inclusion of K.S.'s DNA on the rounds of ammunition.

10

6. Interstate Nexus

38. On August 3, 2022, I spoke with an FBI Interstate Nexus Expert who examined the handguns and ammunition seized from the SUBJECT VEHICLE and Motel Room 235 on June 7, 2022. The Interstate Nexus Expert confirmed that the handguns and ammunition he examined were manufactured outside of the State of California. Because they were found in California, I believe they have traveled in and affected interstate commerce.

B. **On August 2, 2022, LAPD Officers Stopped SOTO and K.S. in the SUBJECT VEHICLE and Seized the SUBJECT DEVICE, a Loaded Firearm, Methamphetamine, and Heroin**

39. Based on my review of an LAPD arrest report and conversations with LAPD officers, I know the following.

40. On August 2, 2022, SOTO was released from state custody for the parole violation arising from the June 7, 2022, conduct.

41. Later that same day, LAPD officers saw the SUBJECT VEHICLE speeding and stop abruptly beyond the limit line at a red light, in violation of California Vehicle Code Section 21453(c), at the intersection of Lennox Avenue and Vanowen Street in Los Angeles, California. The SUBJECT VEHICLE nearly collided with another car that was conducting a right turn.

42. LAPD officers attempted to conduct a traffic stop of the SUBJECT VEHICLE. The SUBJECT VEHICLE did not pull over right away but continued westbound. In my training and experience, it is common for individuals who are carrying contraband or weapons to not pull over immediately when alerted by police in order to attempt to hide the contraband or weapons.

11

43. Eventually, the SUBJECT VEHICLE came to a stop on Vanowen Street west of Van Nuys Boulevard.

44. LAPD officers approached the SUBJECT VEHICLE. The driver was identified as SOTO. SOTO admitted that he was on parole and had just been released from jail earlier that day. SOTO said that he did not have a valid driver's license.

45. The passenger was identified as K.S. The officers asked K.S. to step out of the car and stand by a wall while they waited for a female officer to assist with a patdown search for weapons. In my training and experience, it is common for a male felon to have a female significant other or companion conceal firearms and contraband on her person because they know that male officers cannot conduct patdown searches of females.

46. K.S. attempted to flee on foot from the officers. As she ran, the SUBJECT DEVICE and a small blue bag fell from her person.[8] Inside the blue bag was a clear plastic bag containing 1.5 grams of suspected methamphetamine and a clear plastic bag containing 1.62 grams of suspected heroin.

47. Officers eventually caught K.S. and detained her. During a search of K.S.'s person, officers found a Kahr Arms, Model CW9093, 9mm caliber semi-automatic pistol, bearing serial number G021470.

48. K.S. told the officers that she had additional narcotics inside her vagina. Officers recovered a clear glass

---

[8] Based on photographs of the phone that SOTO was holding on June 7, 2022, and the phone recovered on August 2, 2022, I determined they are the same phone, the SUBJECT DEVICE.

12

vial containing suspected heroin that weighed approximately 18.09 grams.

49. LAPD officers had the SUBJECT VEHICLE towed. Prior to doing so, they conducted a limited inventory search, during which they did not find any contraband or weapons.

### C. SOTO's Criminal History

50. I reviewed certified conviction documents for SOTO and learned that SOTO has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. Robbery, in violation of California Penal Code Section 211, in the Superior Court for the State of California, County of Los Angeles, Case Number LA080667, on December 21, 2015; and

    b. Assault with a Deadly Weapon: A Firearm, in violation of California Penal Code Section 245(a)(2), in the Superior Court for the State of California, County of Los Angeles, Case Number LA082837, on August 26, 2016.[9]

## V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

51. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and

---

[9] According to certified conviction records, K.S. has a prior misdemeanor conviction for battery, in violation of California Penal Code Section 242.

deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

   b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs. The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

   c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

   d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their

digital devices, including in the form of calendar entries and location data.

### VI. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

52. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

    b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

    c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This

includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

53. As used herein, the term "digital device" includes the SUBJECT DEVICE.

54. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

      b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

      c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

      d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously

17

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

55. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

    b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

56. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical

18

feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

      c. The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SOTO's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of SOTO's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

57. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.